Good morning, ladies and gentlemen. Our first case for argument this morning is the Bad River Band v. Enbridge Energy. Ms. Loughran. May it please the Court. The District Court's shutdown order in this case will cause a massive disruption in energy supplies and economies in the Midwest and Canada. The Court based this order on the conclusion that Enbridge was in trespass on 12 allotted parcels within the Bad River Reservation, in other words, less than a half percent of the total length of this international pipeline. The District Court itself recognized that this is a case of a tail wagging a big dog. The Court's shutdown order is prohibited for four separate reasons that we've identified in our brief. First, the band in 1992 made commitments to Enbridge that they would give all the consents necessary to operate a 50-year right-of-way up until 2043. Second, the easements remain in effect until the Interior Department, which has final authority here, as ultimate authority, makes a final determination on the pending easement request. Third, the 1977 Transit Treaty prohibits the United States made commitments to Canada that they would not shut down Line 5 permanently, which is what the order does here. And finally, that the order violates, the Court's order violates Supreme Court precedent because the District Court felt it was constrained and it didn't balance the equities as required by law. With the Court's permission, I'd like to start with the 1992 agreement. And I understand what the District Court found and what the band is arguing. And their argument is that the express language only covers the parcels that the band then owned. And that's true, but it covered much more. And it's just easy to show this by going through and looking at the contract, if the Court will permit. How does your argument there square with Marion? Sure. And let me tell you the specific question, please. In Marion, the Court was clear that when sovereign powers are at issue, we need a clear statement that they're giving up the power. What in that 1992 agreement provides a clear statement that would be consistent with Marion that they are giving up the power in these lands that they don't yet own? Okay, so the Court recognizes we have argued that while the band is a sovereign, the act at issue is not a sovereign act. They are acting as a land owner. Would we have to accept that in order to agree with you? So in other words, if we disagree with the premise of your question, how do you get around Marion? Okay, let me just address the express language, because we want to go there, because we feel the express language resolves this. And if you look at Supplemental Appendix, our Supplemental Appendix, which is pages 4 and 5, and the key paragraph is paragraph 3. And I want to say at the outset that what we're trying to do is give independent meaning to this paragraph, because the way the District Court read it and the band read it does not give it any independent meaning. So the first sentence of that section, paragraph 3, is the tribe and the company will do whatever they can reasonably do to ensure that the express objectives are met. And if it means that you have to do something that's not expressed in the contract. As those objectives are expressed in the agreement, how would you describe the objective expressed in the agreement? Okay, so there's two objectives that we've identified. One is to be able to operate the 50-year, at least it's in paragraph 1 that we have their consent to operate on the lands that they then owned. Then paragraph 3 goes on and says, and it's important because we did not, Enbridge did not want the band to be the one that would be preventing us from operating on the reservation. And this second sentence in paragraph 3 says, one of the company's objectives is to obtain from the tribe all consents it is possible for the company to obtain. Then it goes on and says whether or not, whether necessary or not. So that is not a limitation. You can effectively put a period there. Now the band argues in the district court found that that was needed for the consents to operate on the tribal lands then owned. But we already had the consent and that's in paragraph 1. So in order to give it independent meaning, it has to mean more than the consents that they then owned. How is that a clear statement if we apply Marion? Well it's a clear statement because it says the objective is to obtain from the tribe all consents it is possible to obtain. And we needed those, there's no dispute as the district court found, given that it's a linear pipeline, we needed the parcels that they subsequently acquired. And to be clear, to take a sovereign doesn't, when a sovereign acts, assuming the band is acting as a sovereign, they can't take acts that are designed to frustrate the contract. So in other words, the unmistakability doctrine is narrowly construed. And it does not allow a government, whether it's a U.S. government or a tribe, to take acts that are deliberately designed to frustrate what is expressly provided in the agreement. But that seems different. Frustrate or undermine seems different than having to give affirmative agreement to their sovereign land. Correct, Your Honor. And the language is in the contract. One of the objectives, so they have to do everything they can to ensure that the express objectives are satisfied. And the express objective is to get all the consents necessary from the tribe. That is expressed, that's clear. And so for purposes of Marion, Marion didn't address, Marion was a situation where the lease was silent on the sovereign act. The court has a responsibility to construe the plain language of the contract. The district court only relied on Marion for purposes of the implied duty. But the courts have recognized that once a sovereign enters into a, well here again, it was pursuant to the consent as a landowner. If you look at the regulations and the statutes we cited, I think it's on page 26 of our opening brief, the only reason the band consent is needed because they are a landowner. We wouldn't need their consent, and we didn't in the past, if they didn't own these allotted, have an interest in these allotted parcels. So as the band admits in their brief, at least for the prior negotiations, we didn't need their consent for the allotted parcels. We only needed it once it became clear that the band had acquired interest in the land. And pursuant to congressional policy and pursuant to the regulations, the band was acting as a landowner. So for purposes of the 1992 agreement, we're asking for the court to find that the consent is provided. The band can't breach the agreement by refusing consent. The plain language of the agreement says that they will give all consents from the tribe. And keep in mind that when they entered this agreement in 1992, it was a bunch of sort of, it wasn't one piece of property. It was all sorts of different parcels. And what Enbridge was trying to do was to ensure that the contracting party, the band, would not be the one that stood in the way of our being able to execute the 50 years on the easement. And that's clear from the plain language of the agreement. In the interest of time, can I ask you about a different topic? Sure. What can you tell us, if anything, about the issues that are being arbitrated in Canada or with the International Arbitration Panel? Oh, sure. So to be clear, those, they're in Article 9 of the treaty. And it's the dispute resolution. And those negotiations are confidential. So the parties to the agreement, United States and Canada, have had discussions. But what had gone on in those discussions is confidential. So if I could move... Are you privy to them? Or is it just, is your client privy to those discussions? No, we're not. No, we're not. So it's just the United States and Canada. But Canada makes clear, let me just emphasize a point, that Canada makes clear in their brief, and it's in footnote 18, is that what they're asking for is uninterrupted service. And so if that means in this situation, it requires a reroute, that Canada is not objecting to the reroute. So we're only asking for purposes of the 1977 treaty, that Enbridge have enough time until the reroute is complete. And if you think about what the purpose of the 1970 treaty was trying to accomplish, it was during the time when the Carter administration was there, and we were in lines for gasoline because there was a shortage of gasoline. And Senator Stevens from Alaska had the idea to build a pipeline. The lines for gasoline were in 1979, not 1977. They were created by the administration's price controls. In 1977, there were no lines. No, there aren't. Your Honor, I meant what the administration was trying to accomplish, Your Honor, was to build a pipeline from Alaska to the lower 48 states. It never got built. But the United States wanted to ensure that the promises were, the United States wanted to ensure that once it's built, it does not get shut down. Can you say more about the rerouting plans that have been proposed to date? Sure. You know, how many, what the nature of them are, what the position, you know, of the tribe has been along the way? Well, as the district court found, the suit was filed in 2019. As the district court found, by 2020, we had all the easements for the reroute, and we had all the materials, and we had sort of all of it ready to go, and we had filed the applications with the permitting agencies. So the company has already spent over $100 million to accomplish the reroute. At this point, it is in the hands of the permitting agencies. And we are doing everything we can to, they have it, we don't see any obstacles other than maybe conditions for a permit, but at this point, we're waiting for the adjudication of those permits. It looked like, from the briefing, that the rerouting took the route out of any kind of tribe land. Is that correct? That's correct. So you don't need the tribe's consent for the reroute. Is that fair? Well, the tribe is objecting to the reroute on the ground. That's what the district court found, but my question is a little more specific. Do you need the tribe's consent to the reroute? I don't think that, technically speaking, we need their consent, that the agencies consult with the tribe. There's a consultation process, and that is happening, but I don't think we need, I'm not aware of anything that says we need their consent. Have there been, sorry, just one more follow-up, have there been any plans to reroute this through the tribe land, consistent with the 1992 agreement? Well, the tribe has been clear that they don't want, they've issued resolution that they don't even want Enbridge Line 5 on the reservation at all. And so, no. But you've got the 1992 agreement. Correct. I'm not aware of that. No, we do have the 1992 agreement. But the tribe is saying, but based on those subsequently acquired parcels, and they've acquired... No, I understood my colleague's question to be, is Enbridge planning to reroute it, but avoiding the 12 purchased, formerly allotted parcels? No, the reroute is outside of the reservation. Yes, we know that that's the planned reroute. Is there a fallback within the reservation? Not that I'm aware of. Okay. Not that I'm aware of. So when we talk about a... One more question about permits. Has any federal agency told Enbridge that it must close or reroute Line 5? No. No. They have not. They have not. And the government of Canada has asked the permitting agencies to try to expedite the process pursuant to the treaty. And so they've weighed in, and that's in our supplemental appendix. Your Honor? What's the... I'm sorry. Go ahead. So two questions. When we talk about a rerouting plan, are we talking about one plan, or are we talking about plans, plural, that have been submitted for approval, and the respective authorities are going to pick among options? No. Right now, there's one plan based on the easements, the land that Enbridge has already acquired. Okay. And then the second question I have is, the district court made a reference in one of its... Maybe it's remedies order. One of the final orders that the Federal Pipeline Safety Administration has registered some view on perhaps the mitigation plan, or the closure plan. Sure. Sure. What view has been registered, if any, by that federal... The Pipeline Safety... Right. So the agency here, which is part of the Department of Transportation, and the acronym is FINSA. I apologize. I don't know. The Department... The Pipeline Safety... The Federal Pipeline Group. Okay. Great. Has... They're aware of the meander issue, and they have gone to the site, and they have not... They have powers to shut it down. They have powers to change the shutdown plan. They have not done any of that. So Enbridge has submitted the shutdown plan as we're going forward. Have they made any formal statement at all? Not that I'm aware of, no. They're just nosing around. Well, they're aware of the problem, the issue that the tribe has raised, and they have the power under the pipeline. When you say they are aware, presumably some people employed by the agency are aware. Correct, Your Honor. But the agency acts only officially. Correct, Your... Okay. Okay, correct. So there's been no formal statement. Yes. No formal action of any kind, or any statement? No public statement by the agency, and... It really is extraordinary, in a way, that the United States and all of its agencies collectively have maintained silence about this. Well, the court has asked for the brief, and it was aware of it. We've asked them to break their silence, yes. Right. On page A110 of the blue brief, of your brief, though, there's a statement in here by the The court acknowledges that the current plan has been, in the language is, approved by the Pipeline and Hazardous Materials Safety Administration. So that, where's that coming from? To be honest, that is not correct. He made that statement, and the agency has not approved. The plan has been submitted to the agency. But on what basis would the statement, I mean, that's a very specific thing for a district court to say or to find. Correct. I think that would be... Did they submit a letter, or... Sorry, Your Honor. No. Where's that come from? I think that the view was, is that since the Enbridge had submitted the shutdown plan to the agency, and the agency hadn't objected that it was viewed as approved, and that's how some regulatory schemes work, that you submit it, if they don't object, it's the... That wasn't the rerouting, or the three-year shutdown plan, though, correct? The reference was to the, kind of, the emergency shutdown, if necessary. Correct. That was with respect to the emergency shutdown... To the injunction on the... ...at the end. Correct. Correct, Your Honor. If there are no further questions, I was going to reserve the remaining time for the rebuttal. Certainly, Counsel. Thank you. Mr. Clement. Good morning, Your Honors, and may it please the Court, Paul Clement for the band. The District Court here correctly recognized that Enbridge is engaged in an ongoing and intentional trespass on sovereign land that creates a public nuisance at the meander of the Bad River, but despite that recognition, the District Court declined to issue any remedy that would prompt Enbridge to take action to stop its ongoing trespass. To the contrary, by requiring Enbridge to pay a few hundred thousand dollars a year to continue a trespass that nets Enbridge well over $100 million each year, the District Court all but guarantees that Enbridge will continue to trespass until June 2026, with presumably Enbridge coming in on about May 2026 and saying that Enbridge and the markets need more time to adjust. I suspect that this Court, even with some delay in the government filing an amicus brief, will manage to get the decision out before 2026. I think that's right, Your Honor. I don't doubt that, but the current three-year injunction does say that they don't have to come into compliance until June 2026, and that is the target for our cross-appeal, along with the denial of further relief on the nuisance, because, you know, we think that quite candidly neither the restitution remedy here nor the injunction and its three-year forced easements is enough to prompt Enbridge into action. And it seems to me that ought to be the price point. That seems a very strange thing to say. The action Enbridge says it wants to take is to reroute the pipeline to avoid the reservation. And I gather the tribe has opposed that, the band has opposed that as well. It seems very strange to say Enbridge isn't trying to do anything. They're trying to do something, which the band is opposing. So with respect, Your Honor, I do think what Enbridge very much wants to do is continue business as usual. And Enbridge, I think, recognizes that the reroute is a proposal, but it doesn't require the approval of the band, but it does have a variety of permits from a variety of different governments, and it is not like the band is the only party here who objects to this reroute. If the reroute would take the pipeline out of the land that your client is concerned about, the allotted plots, why is the band actively opposing it? Your Honor, it takes the pipeline route out of the reservation, but it doesn't take the pipeline out of the watershed. And at the end of the day, what the tribe really cares about here is preserving its quality of life, which depends on preserving the watershed, the quality of the band. That sounds like an expressed violation of Paragraph 1 of the 1992 agreement, that the tribe will do what it can. It now sounds like you're saying the tribe is committed to do what it can to stop the pipeline and oppose the reroute. One can make arguments about the 12 purchased parcels, but to say that as a matter of general does it not? I don't think so, Your Honor. First of all, it's Paragraph 3 that I think is the relevant paragraph, and we read that paragraph as really directed exclusively to the tribal parcels that were addressed there and where there continues to be a 50-year easement. And the tribal parcels, as I think the colloquies in the first half of the argument indicated, are not what is prompting the reroute here at all. So we would say that there's nothing inconsistent with the representations in that agreement. But again, the band is far and away from the least or the only problem that Enbridge faces in the reroute, which is why the district court acknowledged that three years isn't going to be enough for the reroute. Five years is likely not to be enough for the reroute. And why is that? Is it because federal agencies are incapable of making decisions? No, I think it is because there is some— without action. So Judge Easterbrook, I think there's just two things that should be kept separate. One is the application for the easement, and that has been in sort of appeal for years. But I mean, that's not going anywhere because those applications don't have the consents that are required, and the agency in its initial determination found them incomplete. Now as to precisely why, given that the applications are facially incomplete, the government still hasn't acted on the appeal, that is a mystery to me as well. But that's separate from the permit requirements that are necessary for the reroute. Those are the ones that have been on file since 2020, and the government hasn't made a decision on, correct? I don't know that they—I'm not positive that they have been fully on file since 2020. But there is a permitting process that is an arduous process that involves commentary from a number of people— How long does that usually take? Do you have any sense of what the average time to get a permit through there is? You know, I don't know the average time. I will tell you, having represented pipeline companies myself in other cases, it is an extensive process that requires approval from multiple agencies, and in my experience, the companies I represented ultimately gave up on the routing because there were so many agencies, not just federal agencies, but state agencies. There is substantial opposition to the reroute from governments within Wisconsin besides the tribe. The EPA, and we quote this on page 15 of our reply brief, but they say that the proposed reroute, now I'm quoting, quote, will result in substantial and unacceptable adverse impacts on the watershed. So the EPA itself, while not formally opposed at this point, because that too takes time, but has registered their own concerns about the reroute. So I think sort of saying that the sovereign rights of the band have to be put on the back burner for the reroute is just nonresponsive. It just looks to us like everything has been put on the back burner. And, of course, we know nothing about the negotiations between the United States and Canada, but one would think the minimum commitment of the treaty is that the United States as an entity not string out the process so long that it's impossible to keep the pipeline operating. The United States has made that commitment, and it's very hard to see how that commitment is being fulfilled. Well, obviously that's something that the government will address if it indeed files a brief in 30 days. I do think there is an argument, and I don't know whether the United States will adopt it, but I might think that the United States is going to take the position against Vis-a-vis Canada that the United States is not in violation of its treaty obligations. And I think there is an argument that Article 4 of the treaty really allows this sort of nondiscriminatory regulation. And if this pipeline stopped in Port Huron instead of crossing another five miles into Ontario, the treaty would be completely irrelevant and all of these issues would be exactly the same. Can we talk about Article 4 for a moment, please? Sure. Well, maybe the government and the agency overseeing this would be a regulation. How could the district court's order here be a regulation that would qualify or make this fall under Article 4? I think under Article 4 you could think of the trespass laws in this nation as being the nondiscriminatory regulation by the appropriate authorities. And for what it's worth, the way I would sort of harmonize all of these articles in this treaty, because it's a little bit confusing to figure out how it all fits together, but the treaty does very much seem to allow for nondiscriminatory regulation. I agree it definitely deals with regulations. Your argument has been that the district court's injunctive order is permissible under Article 4 because it falls within that regulation language. And I never think of a court's order as a regulation. So my specific question for you is what support do you have or how can you convince us that the court's injunctive order here would be a regulation under Article 4 of the treaty and therefore permissible? So let me take two cracks at it. One is I think there's an anterior question, which is to say, is the district court's injunction really properly understood as a public authority that's constrained by Article 2? Yes. I'm assuming that or just moving on to Article 4. I agree with the premise of your statement, but I'm more focused on Article 4. Okay. But if I could spend 30 seconds on the premise, I mean, the premise seems like quite a premise because I wouldn't think naturally that you would think that this kind of international agreement constrains the equitable authority of the federal courts. But if you're not with me on that and you think Article 2 is satisfied, and then we get to Article 4 as an exception to Article 2, then I would say that in a sense, the way to think about this is it is the authority of the tribe and federal common law to prohibit trespasses that is the regulatory authority, and the district court is just enforcing that. And as I was suggesting earlier, I think that kind of has to be right for this treaty to make sense in general because all of that nondiscriminatory regulatory authority, it has to be backed up by the ability to shut down a pipeline if it just says, well, it's nice that you have nondiscriminatory taxes and environmental policies and all of that, but we're just not going to comply. Mr. Clement, I thought there might be a different point, and maybe you're getting to it. By its terms, Article 4 saves that kind of ordinary course regulatory authority, right? Yeah. One source of the ordinary course regulatory authority seems to me to be that and the Federal Pipeline Safety Act saves tort law. And so I know there's a couple links in that chain, but that seems to me to be a possible construction of that too. I would agree with that, Your Honor. I think there are multiple possible constructions, and again I'm a little bit at a disadvantage here because I assume that the government is not going to take the position that the United States is in violation of this treaty. And so I think there are multiple paths for them to get there. I would say that I'm not even sure that this treaty is really designed to be enforced by pipelines in federal court as opposed to through the Article 9 process. And so I think there may be an argument that although this may be like self-executing in the sense that Congress didn't have to pass a statute, it's not self-executing in the sense that the pipeline company could come into federal court and just say, oh, there's a violation of Article 2 or Article 5 and we get an injunction or something. Can you go back to Judge Easterbrook's question about Section 3 of the agreement? Yeah. Do you agree that by its terms it's imposing, call it a best efforts obligation, whatever you want to call it, an obligation upon the band outside of that agreement? In other words, because it has that language, even if it means that one or more of both parties must do something which is not expressly described here, what's the content of that? So the content and the context of that is this is the first time that for this pipeline anybody's trying to get a 50-year easement over any part of the relevant lands. The first two sort of tranches of 20 years are dealt with a single easement that covers both the tribal parcels and the allotted parcels. So in 1992 they get the idea that they might be able to get a 50-year easement over the tribal parcels, but this is something new. There's even some correspondence in the record that shows that the Bureau wasn't quite sure this was a great deal for the tribe. And so the way I read Section 3 is it is just a representation that the tribe will do everything within its power to get this 50-year easement over the tribal parcels over the line. And I think that's why, as you indicated in the first part of the argument, even Section 3 references the agreement, the terms of the agreement, and the agreement is very fixed on the existing right-of-way as distinguished from the original rights-of-way that included the allotment parcels. And in this respect, I think if you read the whole agreement, it is very focused on that 50-year easement to the point that the $800,000 that is paid the tribe is held in escrow, but then it's released from escrow once the Bureau grants that 50-year easement. How is it consistent, though, if the objective of the agreement is for the 50-year easement, which is going to enable Line 5 to operate for that period of time, how is it consistent with that for the ban to withhold consent vis-à-vis the allotted parcels? I think it's fully consistent because everybody understood that the allotted parcels were not addressed by this agreement. There would be separate requirements that would be needed for those parcels. The pipeline company at the time, it's actually Enbridge's— But it's odd, though, that they would exercise consent in a way that's defeating a primary objective of the 1992 agreement. They're not exercising consent or withholding consent until 20 years later vis-à-vis completely different parcels. And I'm not even sure if this were more explicit, and it said that the tribe hereby guarantees that if it acquires any additional parcels pursuant to the ILCA, that we hereby now agree that 20 years hence we will give our consent to those allotments. Like, I have some serious doubts that that would be kind of a valid contract term if it were explicit. But as Judge St. Eve pointed out, it's not remotely explicit. And so in the context of Marion and enforcing the Non-Intercourse Act, I think this just doesn't really come close, and the district court's 100 percent right, that that relatively vague language in Section 3 does not excuse this trespass. And I think it bears emphasis that the contemporary understanding of the pipeline company is exactly consistent with that. If you look at page 54 of the ban's appendix, there is an internal Enbridge email that, in 2016, acknowledges that the project is currently in trespass. Nobody at that point said, ah, don't worry about the trespass. We have Section 3 to fall back on. Nobody said, oh, don't worry about the trespass because 558C of the APA gives us a get out of jail free card. They understood from 2013 and expressly in that 2016 email that they were in trespass. They had a problem. And again, that's consistent with the easements themselves. One of the things that I think makes the three-year sort of stay of the injunction so problematic here is that the easements themselves address what is a reasonable period of time after the easements terminate. It's six months. The pipeline company with both the 50-year easement and the 20-year easement, the express term is six months to vacate the premises. Now, that happens to be also the amount of time that Michigan has determined that the propane Although that would be relevant to when there's a trespass. I'm not sure the six months in the easements is relevant to the district court's equitable weighing and determination for the pipeline and the length of time. Because the district court in deciding three years really weighed the equities and looked at the economic harm this would have, the impact it would have in Michigan and Canada, a lot of things that aren't captured or addressed in the easements. Well, I would say the easements are still powerfully relevant to that balancing. They are relevant. I'm not disputing they're relevant. The court looked at them, but there are a lot of other factors. It certainly isn't dispositive or close to it. Well, here's what should be close to dispositive, which is the Non-Intercourse Act. And so, as we argue in our briefs consistent with Oakland Cannabis, when you have a federal statute like that, it sort of tells you what the public interest is as determined by Congress. And just as the district court in Oakland wasn't free to say, well, the Controlled Substances Act says there shouldn't be any medical marijuana, but I think these patients need it, so we'll create an exception for an injunction. In the same way, when tribal consent is needed, then that's Congress's determination in the public interest. The other thing that I think it bears emphasis that is missing from the district court's public interest analysis is a consideration of the countervailing benefits for the environment and for the other businesses of the shutdown of the pipeline. Because, you know, there was this consideration of gasoline prices and the like. The analysis of that is itself deeply flawed because Enbridge's own expert agreed that we were talking about half a cent at the pump if there is a shutdown. The district court sort of got that conflated and thought that, well, you know, that only happens if all these other things happen. But no, if there's a shutdown, both parties' experts said the economic impact is half a cent in Wisconsin and Michigan, five cents a gallon in Ontario. And compared to that, all of the potential benefits for the environment of preventing this potentially catastrophic rupture in the pipeline, I mean, I think that's missing from his analysis entirely. But the principal legal flaw, I think, is the Oakland Cannabis, failure to consider Congress's judgment in evaluating the public interest. Mr. Komen, can I switch for a moment, please, to the monetary damages that were awarded here? You're challenging the low, relatively low monetary, both profits as well as avoided costs. It seems to me that the district court's ruling was impacted in part by your client's actions here and your client's failure to do anything to mitigate the meander, either on your own or in connection with the company. How do you respond to that? So I say to the extent that is true, that's mixing apples and oranges in a way that injects error into the process, because maybe the ban's efforts are relevant to considering the nuisance injunction. If I have time, I want to address why that's still a misguided concern. But it should have no impact on the restitutionary remedy, especially because the district court judge was expressed that there's an intentional trespass here. And so at that point, I don't think you say, well, the profits that will stop the trespass is either all the profits or all the avoided costs of the reroute. But I'm going to cut that in, reduce that by 99% because I don't think the ban has done everything it could to facilitate the reroute, which really has nothing to do with the trespass. So that would be apples and oranges. Just briefly on the actions vis-a-vis the meander, I think all of that is really a misguided consideration because everything that Enbridge has proposed is either a further trespass on the land and a violation of the ban's best view of what would comply with the Clean Water Act. Separate from what Enbridge is proposing, though, your client hasn't done anything on its own. Your client could go out there and put sandbags in or take other mitigating actions at the meander. And from the record in the district court's findings, it doesn't look like your client has done anything on its own. Well, I mean, two things about that, Your Honor. First of all, I'm not sure, like if we put sandbags in the river, that's a discharge. I just used that as an example that the expert said was something. There were a lot of examples of mitigation that could potentially help the meander. There really aren't that many options that are available that don't at least implicate the Clean Water Act and the view that these discharges would be impermissible. But, I mean, in all candor, this has never been about money for the tribe. This has always been about preventing, you know, this continuing trespass. And so I don't know that it's really our obligation. But you can see the problem. The meander is online that the band owns. The band expresses concern that there may be a discharge, which would be an environmental problem. And the band, with the power to do something about that, has elected not to. You can see why that might be a problem. I can see why that would be a concern. I guess what I would say, though, is, you know, as far as the band is concerned, this has been in trespass since 2013. But this is the nuisance claim, not the trespass. And the whole argument for nuisance is we're concerned this could erupt any day. It seems to challenge your credibility a little bit, not yours personally, but your clients when they're saying, we're really concerned about all the environmental impacts that could happen if this bursts, yet they're not doing anything on their own, putting aside the company, but on their own to try to mitigate that. I mean, you know, they're certainly trying to monitor the meander and try to do so. The district court made a factual finding that they were not doing anything to mitigate it. So I'm relying on the record. They're not doing the kind of things that Enbridge is. They're not doing anything, is what the district court found, nothing. And, again, their position is they don't need to do anything because the pipeline's been in trespass for over a decade. And what they've proposed to the district court is that it just be shut down for the spring flooding season. I asked Ms. Loughran whether any federal agency has ordered the pipeline to be shut down on environmental grounds, and the answer was no. The corresponding question for you is has your client asked the EPA or the Army Corps of Engineers or anybody for permission to do something to prevent an environmental problem at the meander? And I believe the answer to that is no. No, no request for permission. I mean, you, when Judge St. Eve first asked this question, you said, well, if we did anything, it would violate the Clean Water Act. But, of course, the way to find out whether it would would be to ask the EPA or maybe the Corps of Engineers, but apparently that hasn't been done. No, with respect, the Clean Water Act authority has been delegated to tribal authorities, and the tribal authorities themselves have made the determination that the discharge into these waters would not be consistent with the Clean Water Act. So they don't have to wait for the feds to make that determination under the delegated authority under the Clean Water Act. And, again, their position, which doesn't seem that unreasonable to me, is this is in trespass. This should be shut down independently, not because of the nuisance, but because of the trespass. And so it should not be incumbent on us to take actions that essentially perpetuate the trespass by putting riprock that will be there forever, not just for three months, not just for the spring flooding season and the like. And that seems to me to be a perfectly reasonable position. Mr. O'Klank, can I keep you from one other question? The watershed, the risk to the watershed proposed by the rerouting plan, and beyond expressing concern about that, has the band said, look, we definitely oppose the current rerouting plan for that reason, but we have three or four others in mind that may be fine, they may be achievable as an economic matter, and they would not present these risks. You know, Enbridge, please consider the following. We have certainly said in negotiations that— The reason I'm asking you is it just seems like from this side, the parties are at a complete impasse and not in any way working together to try to find a tolerable solution. Imperfect, I'm sure, but tolerable. I think the band has been open to a reroute that would take the pipeline outside the watershed. Now that requires, you know, more easements, more lines of pipe, so that is in a sense why I think the parties— By outside the watershed, you mean outside the Mississippi River watershed? No, the watershed— Or just the Bad River watershed? The Bad River watershed, and probably I think there's three rivers on the reservation, all of which feed pretty directly into Lake Superior. That's what they're saying. The Board of Engineers defines the watershed as basically the Mississippi River and a lot of distance on the sides of it. Well, I mean, that might be for purposes of, like, the continental divide or something, but it's not that unreal. It is really—you know, these are relatively short rivers that flow directly into Lake Superior. I'm just trying to be sure that you're defining the watershed as the Bad River watershed. I think it's Bad River plus the other two rivers that are directly on the reservation. But is there a way to do that that avoids the Bad River? Yes. I mean, you know, I would imagine my friend on the other side is going to come up here and tell you that that's just not economically feasible and that would require, like, 100 miles to get around instead of 55 or whatever the current proposal is. So none of this is easy. But I don't think—you know, given that the band's fundamental concern is the pollution concern to the watershed, I don't think it is unreasonable for them to say that you're not really addressing our concern if you reroute this. And if you look at the reroute proposal, it basically hugs the borders of the reservation  I hope you can see what part of the problem is. It's not simply the lack of cooperation. But if you take this pipeline out of the Bad River watershed, it will be in some other watershed, right? The whole interior of the continent is drained by the Mississippi, although water that goes into Lake Superior is probably going to go out the St. Lawrence, out into the Atlantic. But there is no place anywhere around that is not in a major watershed. I understand that concern, but not all watersheds and not all environmental risks are created equal. And, you know, it is the testimony of both experts here that if Line 5 were shut down, there would be substantial additional capacity that would go through Line 78. If you look at Line 78— I hope you can see the problem of a federal district judge making what amounts to foreign policy and saying, well, it's okay with me sitting in Wisconsin if the Canadians bear the following extra price per gallon. How much that happens ought to be the subject of an agreement between the United States and Canada and not a unilateral economic choice by a federal judge. So one thing I would say just to contextualize that, I mean, I understand that the implications for Canada are something that would be taken into the public interest calculation at a minimum. But what I would say is Line 78, which I think still ends up in Sarnia, Ontario— I just want to be responsive to your question. If you look at the route of that, it is a route that doesn't go right next to the Great Lakes. It kind of cuts through. And I'm not saying that it's not a single river watershed it goes through, but that is a route that's already an established route that poses much less risk of environmental catastrophe. Thank you, Your Honors. Thank you, Mr. Clement. Ms. Loughran, anything further? We extended Mr. Clement's time a considerable amount, so we'll give you 10 minutes for rebuttal. Thank you, Your Honor. I wanted to start—I appreciate that—with the meander issue because this is something that the company continues to try to work with the ban on. As the district court noted in its final order in June, that the banned representative had testified that she planned to grant or considered granting a sandbag proposal with conditions. After the final judgment was entered, they denied it. And Enbridge tried again with a different type of proposal, a tree revetment, one that provides trees that are part of the natural river habitat, and they denied that one. So we continue to try to address this problem, and the ban refuses to work with us on it. Have there been any mitigation efforts at the meander since the district court's judgment? The ban has not permitted any mitigation efforts at the meander. And with spring coming, this is a concern. So including the installation of the large boulders and all that? That's right, that we have not been able to do any of that work because the ban is standing in the way. We've tried repeatedly with different applications, with different ways of going at the ban, trying to address any concerns that they'd say in their decision, and each one is denied. And to your knowledge, the ban hasn't done anything on its own either? No, it has not. And they, in our view, are creating this environmental nuisance. I wanted to address, so assuming a trespass, I wanted to get to the treaty issues because I know that was a part of the discussion. Now assuming a trespass, now before I do that, I wanted to reiterate, Section 3, as the way counsel for the ban has described it, is intended to give consents for the 50-year right-of-way. We already have the consent in Paragraph 1. It's meaningless if you read the contract. So we're just trying to give independent meaning to that paragraph. Assuming the court rules against us and finds that there is a trespass, what we're asking for as a remedy, whether you use it as the transit treaty or the district court's injunctive powers that should have been exercised, is exactly what was granted by the Ninth Circuit in the Kalispell decision. So in the Kalispell case, we had two different panels from the Ninth Circuit, and they both reached the same conclusion, that even though there was a conscious trespass, and in that case it was a conscious trespass for decades, the reservation tribal land as well as allotted land was completely underwater for decades. It was a conscious trespass which was remedied by damages in the past and in the future. And the Ninth Circuit said to the district court, you have the discretion on remand if you decide that it's needed for the public interest to delay the injunction until the permit, in that case, was filed with FERC and granted by FERC. So the utility hadn't even filed. We filed this in 2020. So those applications, I think there was questions about that, have been pending since 2020. So we're just asking, and the district court did that on remand, and then on appeal the second time, a different panel said, we agree that it's within the district court's discretion. Now we cited the Kalispell case to the district court, and he said that case is distinguishable because it wasn't a conscious trespasser, but it was. That it was a finding by the district court, affirmed by the appellate court, that there was a conscious trespasser. So that's the relief that we're seeking. Specifically, you want an injunction that says, wait until the permit is granted. Sure. What if it's not granted? Yeah, let me be clear. So until the permit is granted, then the construction is done. What if it's not granted? Well, there's no reason that it won't be granted. It's been, you know, our view is. I guess Mr. Clement might disagree with that. Well, he has said that. But if there are any major environmental reasons for denying the permit, we would know by this point. You would hope that if there were a major environmental reason for not allowing the permit. Correct. It would have been decided years ago. So the fact that the agencies aren't acting is itself a mystery. I don't know how either side can express confidence about why a federal agency isn't doing anything. Well, I think it's a little bit more complicated that they're waiting for the Wisconsin agency to issue an environmental statement. Well, it brings, I mean, this is a serious point for me. It brings me back. The district court has made a declarative statement that the pipeline safety administration has approved. Approved is the language. The December 2022 monitoring and shutdown plan. That sounds to me like agencies done something to put itself in a position of approving. I mean, it's a direct finding. Right. And that goes to the meander issue. As opposed to. It sure suggests regulatory involvement. And the premise of our whole dialogue is they really aren't looking at anything. No, I don't think that's true at all. That they're really not looking at anything, but they're emulating Rip Van Winkle. I think the, this is the process of permits, particularly a project this large because we have to go around the reservation. And so it is taking time. But again, there's no. Four years. Four, four years. Long time. Is there a, does the record show whether there's a dialogue between the company and the band about alternative rerouting? In other words, it's Mr. Recommend is as clear as day. We have very serious environmental concerns. With respect to the watershed. And we're not going to relent on that. Right. They're not going to go away. So have you sat down and said, all right, what. What could we do to mitigate those concerns and try to work together more. Let's let's brainstorm about options. Okay. And you might say, well, we can't do that. That's going to cost too much. And et cetera. Is that kind of dialogue happened? Not in the record, but to be honest, Enbridge is available and willing to roll up our sleeves with the agencies and with the tribe to do it. We've had a lot of litigation to just come to that now. I'm sorry. I mean, it just seems like this is inviting of the parties to get together. And it's almost as if the parties have, you know, mutually declared war against one another. It looks like just to pick up on it. It looks from the record like you had mediation discussions before the lawsuit was filed. Right. But since then, as Judge Scudder is saying, both sides have dug in their heels and there haven't been any really meaningful discussions between the two of you. So that's not a fair or correct statement. And I feel a little restrained because when you talk about settlement discussions and what is happening in those and mediation, particularly with the court's mediation. I'm not asking for the substance, just for the fact that they happen. Yes. They continue to happen through this mediation. Meaningfully. The difficulty is when this just gets thrust into a federal court on an issue like this, this injunctive power starts to look very regulatory. Okay. So let me just answer that because the court said something about Article 4. And to be clear, Article 4 references environmental. The district court here ordered the shutdown based on the trespass. And there was no injunction based on the environmental. But in any event, there's nothing in Article 4 that allows them to shut it down. What it's talking about is continued regulation. The only exception. If the shutdown was actually based on the trespass, it should have already happened. I'm not sure that I'm following, Your Honor. If the reason for the shutdown was just that there was a trespass, then there should be, as Mr. Clement says, just a shutdown order. Stop the trespass and stop it now. But in fact, the district court's reasoning includes a lot of the kind of considerations that a regulatory agency takes into account and that are doubtless being discussed between the United States and Canada. It's not simply a remedy for a trespass. So as I understand it, the treaty, when they talk about public authority, is including the court. There's no doubt that a federal district judge is a public authority under the treaty and so are we. Then if you think about the district court's reasoning, the district court started to say, I'm going to be able to reconcile these. That's what he said in his September order. And then by the time you get to the final judgment, in between there, the district court says, I'm actually not going to put it on the scale at all. I'm not going to give it any weight. And that's wrong as a matter of law. It's a self-executing treaty that is binding on the district court. Do you agree that the treaty is only relevant to any adjunctive relief and not to the monetary remedies? Well, in this case, that's correct. Yes. Yes, Your Honor. I mean, I think there could be certain circumstances where it would be so much. We've got enough here. Just in this case.  Sorry, Your Honor. I just wanted to briefly address the non-intercourse act. Very briefly. The non-intercourse act, which is addressed in our brief, provides plenty of authority where the courts have said the non-intercourse act and the district court so found here does not impact the judge's injunctive powers. Thank you, Your Honor. Our plan is to wait to hear, at least from the promised yes or no decision on filing an amicus brief. And when we receive that, we may issue an order telling you what's going to happen next. But we're not going to decide the case in the next month. We really would like to hear from the United States. The case will be taken under advisement. Thank you, Your Honor.